**UNITED STATES of America, Appellee,**

v.

**Eric Alan WAYNE, Appellant.**

**UNITED STATES of America, Appellant,**

v.

**Eric Alan WAYNE, Appellee.**

**Nos. 89–1486, 89–1563.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1989.

Decided May 21, 1990.

Rehearing Denied July 6, 1990.

---

Louis M. Jepeway, Jr., Miami, Fla., for appellant.

Richard L. Murphy, Cedar Rapids, Iowa, for appellee.

Before McMILLIAN, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

A jury found Eric Alan Wayne guilty on three counts of possession of cocaine with the intent to distribute, and aiding and abetting possession with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1)

(1988) and 18 U.S.C. § 2 (1988). Wayne was also found guilty on Count V of conspiring to distribute, and possess with the intent to distribute, cocaine and marijuana in violation of 21 U.S.C. § 846 (1988). The district court[1] granted a new trial on Counts I and II, involving offenses occurring in April, 1987, because the government had withheld evidence critical to Wayne's cross-examination of a witness to those drug activities. On appeal, Wayne argues that the district court erred by: (1) denying his motion for a new trial on Counts III and V because the suppressed evidence was also material to those counts and there was a reasonable probability that its disclosure would have affected the outcome of the trial; (2) denying his motion to suppress evidence seized pursuant to an allegedly invalid search warrant; and (3) making certain sentencing determinations. On cross-appeal, the government argues that the court abused its discretion in granting Wayne's motion for a new trial on Counts I and II. After considering these arguments, we affirm the judgment of the district court.

The facts leading to Wayne's arrest and convictions are complex, and involve a series of narcotics transactions in Florida, Iowa, and Arizona, extending over several years. The indictment charged four counts of possession of cocaine with the intent to distribute, and aiding and abetting possession with the intent to distribute, on the following dates: Count I charged an April 26, 1987 offense, Count II charged an April 29, 1987 offense, Count III charged an offense occurring between September 9 and September 11, 1987, and Count IV charged an October 13, 1987 offense. Count V, the conspiracy charge, was alleged to have occurred between April 1982 and May 1988. Wayne was convicted on four counts, but was acquitted of Count IV. He was sentenced to serve 300 months imprisonment. The issues on appeal focus on the testimony of several witnesses, all of whom had been arrested on drug charges and had agreed to cooperate with

the government, including Tim Shelton, Bart Hoffman, Joseph Newland, and Chris Mottinger. It is not necessary here to recite the evidence in detail, as we will refer to it in considering the specific claims of error.

## I.

■ Wayne argues that the district court erred in refusing to grant a new trial as to Counts III and V because the suppressed evidence, on which the court based its grant of a new trial for Counts I and II, was also material to Counts III and V, and there was a reasonable probability that its disclosure would have affected the outcome of the trial.

After the jury convicted Wayne on Counts I, II, III, and V, he filed a motion for a new trial because the government had failed to disclose the existence of drug transaction records kept by witness Bart Hoffman, which were seized by the FBI when Hoffman was arrested on drug charges. The records referred to debts owed by Hoffman, debts owed to him, and other details of drug sales. The court granted a new trial for Counts I and II because it found that Hoffman was the only witness who identified Wayne as the source of the drugs involved in those counts. Hoffman's credibility, therefore, was critical to those counts, and the court found that Wayne's lack of opportunity to cross-examine Hoffman, and perhaps impeach him, concerning the undisclosed records undermined its confidence in the verdict on those two counts. The court concluded that the prosecution's failure to disclose the suppressed records did not undermine its confidence in the verdicts on Counts III and IV, however, because Hoffman's testimony was not factually critical to those counts, and the jury's verdicts on those counts were supported by an "abundance of evidence." (Sentencing Hearing, Mar. 3, 1989, at 199).

---

1. The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa.

Wayne challenges the court's conclusion as to Counts III and V. He argues that the suppressed evidence not only undermined confidence in the counts upon which Hoffman testified, but also tainted the counts upon which Newland testified. He contends that the complete impeachment of Hoffman also completely undermined Newland's testimony.

■■■ It is beyond dispute that a defendant's constitutional right to due process is violated if the prosecution withholds evidence favorable to the defendant, and the evidence is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). It is also firmly-established that the *Brady* rule applies to impeachment evidence, as well as to exculpatory evidence. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court refined the principle announced in *Brady* by providing a standard to determine whether the suppressed evidence is material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383. Thus, our task is to determine whether there is a reasonable probability that the outcome of the trial for Counts III and V would have differed if the prosecution had provided Wayne with the records seized from Hoffman as part of the discovery file. Based upon a thorough examination of the record,[2] we are satisfied that there is no reasonable probability that the results would have differed for those counts if the Hoffman records had been disclosed to Wayne prior to trial.[3] We are impressed with the careful analysis which the district court performed in distinguishing between the evidence on Counts I and II, and the evidence on the other counts. We are persuaded that the court did not err in re-

---

2. We feel compelled to state that the brief of the government was of little help on this issue. While it is evident that an analysis of the record was necessary to decide this issue, the brief submitted by the United States Attorney's Office contained no factual discussion and no citations to the record on this point. Our analysis is based upon our own study of the 1,050 page trial transcript. Most lawyers feel that they can best serve their client by assisting our efforts by factual discussion with citations to the record. Federal Rule of Appellate Procedure 28(e) requires page references to the record and transcripts. We have previously noted, in another case which required a study of the record because the briefs did not contain a factual discussion, that:

> [I]t is difficult to believe that the United States Attorney would not find the strongly incriminating evidence to be the most effective presentation of his case. Counsel should comply with the rules requiring specific references to the record or transcript. This is essential for efficient review by this court. As other courts have observed, counsel act at their peril in not doing so.

*United States v. Cohen*, 738 F.2d 287, 290 (8th Cir.1984). Possibly the United States Attorney's Office believed that leaving the issue in our hands was the most effective method of representing the client, but we believe that most clients would not agree. Our increasing docket loads make the briefing assistance customarily given by counsel even more essential.

3. Wayne also complains that the government withheld favorable evidence concerning Newland, including an address book and other documents taken from Newland's safe deposit box. We are satisfied that there was no *Brady* violation with respect to these materials. Wayne agrees that "Newland was heavily attacked on cross-examination." (Appellant's Brief at 31). Substantial evidence of Newland's drug trafficking activities and his drug abuse was before the jury. (Tr. 822–52). In light of this fact, we believe that the suppressed evidence would have been merely cumulative, providing no further impeachment benefit. This is a situation where the prosecutorial suppression of evidence does not require the grant of a new trial because the defendant conducted a thorough and vigorous cross-examination of the witness without having access to the suppressed evidence. *See United States v. Roberts*, 848 F.2d 906, 908 (8th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 322, 102 L.Ed.2d 340 (1988).

Finally, Wayne alleges a *Brady* violation with respect to materials concerning another witness, Tim Shelton, which were not disclosed prior to trial. We believe that this evidence would not have enhanced Wayne's cross-examination of Shelton to the extent necessary to violate the *Brady* rule.

fusing to grant a new trial on Counts III and V.

## A.

Count III was not based upon Hoffman's testimony, unlike Counts I and II. As the district court recognized, Hoffman's testimony provided the only evidence that Wayne was the source of the cocaine in the Count I and II April 1987 transactions. By way of contrast, Count III, the September 1987 transaction, was established primarily through Joe Newland's testimony. A review of the evidence on Count III leads us to conclude that the suppressed evidence was not material to this count. Since the suppressed evidence was not material to those counts, for purposes of the *Brady* rule, Wayne is not entitled to a new trial on Count III.

Newland and Wayne began planning a three kilogram cocaine deal in July or August 1987. (Tr. 752). Wayne told Newland that he felt that Hoffman, who had previously acted as a middleman in the distribution process, was "ripping him off and lying to him." (Tr. 753). Wayne wanted to avoid selling narcotics through Hoffman, and therefore, he proposed selling directly to Newland. (Tr. 753). Newland and Wayne discussed prices over the telephone, and then Newland and another individual, Larry Shreeves, flew to Miami, Florida to complete the deal. (Tr. 754). Newland purchased the three kilograms from Wayne at Wayne's home in Miami. (Tr. 754). They had agreed upon a price of $18,500 for each of the three kilograms, (Tr. 754), but Newland paid only $40,000 to Wayne at the time of the sale. (Tr. 755).

After the sale, Wayne, Shreeves, and Newland went to the Miami airport in order to rent a car. (Tr. 755). Shreeves was to drive the cocaine back to Iowa while Newland planned to fly back. (Tr. 755). Wayne rented the car for Shreeves because Shreeves had forgotten his driver's license and other identification. (Tr. 755). Shreeves and Newland were reunited soon thereafter in Iowa City. (Tr. 755). Newland called Wayne from his motel because Wayne wanted to make sure that they had arrived without incident, and also because Wayne was concerned since the car was rented in his name. (Tr. 757). Mark Stearns was at Newland's motel, and the two men drove to Shreeves' motel to pick up the cocaine. (Tr. 756). Stearns, Shreeves, and Newland then used the rental car to drop off Shreeves at his father's house, to take Stearns to pick up his Corvette, and then to drive to the Cedar Rapids airport to return the rental car. (Tr. 757). After Newland returned the rental car, Stearns picked him up, and Newland gave him the cocaine. (Tr. 757). Newland received money from Stearns for the cocaine, and then he returned to Miami to pay Wayne the remainder of the selling price, approximately $15,000. (Tr. 757–58).

While Newland was in Miami to pay the amount due on the sale, Wayne gave Newland a Burmese sapphire ring to sell for Wayne. (Tr. 758). Wayne explained that Hoffman had given him the ring as collateral on a marijuana deal. (Tr. 759). Newland then returned to Phoenix. (Tr. 759). The ring was later seized from Newland's safe deposit box after his arrest, and introduced into evidence at Wayne's trial. (Tr. 788).

We agree with the district court's conclusion that the Hoffman drug transaction records withheld by the government were not material to Count III. There is not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. Hoffman did not testify at trial about the circumstances surrounding Count III. Hoffman's lack of knowledge as to this drug transaction is explained by the evidence that Wayne wanted to avoid dealing with Hoffman because he felt that Hoffman was "ripping him off and lying to him." (Tr. 753). Furthermore, Newland's testimony was based upon his personal knowledge, not upon information obtained from Hoffman; therefore, Hoffman's credibility was not in issue.

Wayne attempts to erode Newland's credibility by arguing that it is implausible that an experienced drug dealer, as Wayne

allegedly was, would take the risk of renting a car in his own name in order to have others transport narcotics from Florida to Iowa. This argument was before the jury, (Tr. 838–41); we are satisfied that it is insufficient to defeat the substantial and persuasive evidence presented on Count III.

### B.

Wayne also contends that the suppressed evidence was material to Count V, which charged that Wayne conspired to distribute, and possess with the intent to distribute, marijuana and cocaine, between April 1982 and May 1988. This argument is also unavailing.

Even if we refuse to consider the conspiracy evidence provided by the Hoffman testimony, on the ground that Wayne should have been permitted to cross-examine Hoffman concerning the suppressed evidence, we are satisfied that the remaining evidence, discussed below, establishes that the result of the proceeding would not have differed had the Hoffman records been disclosed to the defense prior to trial. Therefore, there was no *Brady* violation as to Count V.

Tim Shelton testified that he and another individual, Marcos Melendez, purchased cocaine from Wayne, and then distributed it in Iowa. (Tr. 141–42). Shelton stated that he had several telephone conversations with Wayne in 1981[4] about these transactions, and recalled dealing with Wayne three times involving one-half to one pound sales of cocaine. (Tr. 142). He specifically remembered talking with Wayne about Wayne acting as his supply source for narcotics. (Tr. 167–68). He met Wayne personally only once, when Wayne travelled to Cedar Rapids in the spring of 1982 to collect money for cocaine which Wayne had sold to Shelton and Melendez. (Tr. 140–41).

During 1981 or 1982, Shelton testified that Wayne called the Nautilus health club owned by Shelton and Melendez four to six times to discuss drug transactions. (Tr. 160–61). They discussed details of cocaine sales, such as distribution and cash flow. (Tr. 161). According to Shelton, the substance of the conversations was as follows: "Mr. Wayne would say, 'Are you happy with the product? Are you done selling the product, and when will you have the money and when will Mr. Melendez be back to see me?'" (Tr. 180).

Shelton also testified that he wrote Wayne a letter in the winter of 1986 telling Wayne that he was no longer working with Melendez, and expressing an interest in using Wayne as a cocaine supplier. (Tr. 143–44). Wayne did not respond to the letter, but it was later seized from Wayne's house. (Tr. 144). Over Wayne's objection, the letter was introduced into evidence at Wayne's trial. (Tr. 145).

Joe Newland also testified as to the conspiracy charge. In addition to the testimony about the Count III transaction previously discussed, Newland testified about other drug-related contacts with Wayne. In late 1986, Newland travelled to Florida, carrying $40,000 in cash, with an individual named McEntire to purchase marijuana. (Tr. 830). While Newland slept in a motel room, McEntire disappeared with the cash. (Tr. 830–31). Wayne called Newland at the motel to inform Newland that he had some marijuana for him, and then Wayne met Newland in front of the motel. (Tr. 832). Newland spent the night at Wayne's home and, the following day, Wayne assisted Newland in flying home. (Tr. 833). There was no drug sale at that time because of the money disappearance. (Tr. 833).

Newland also testified that, beginning in late 1986, Wayne called him several times a month because Wayne was searching for Hoffman. (Tr. 834–35). Wayne was angry that a marijuana deal with Hoffman had not worked as planned and Wayne was left holding jewelry which Hoffman had given as collateral. (Tr. 835). The collateral included the Burmese sapphire ring previous-

---

**4.** The conspiracy count was alleged to have occurred between April 1982 and May 1988. This evidence concerning events prior to that time period is helpful to explain the relationship among the witnesses and the defendant.

ly discussed, (Tr. 836), which was seized from Newland's safe deposit box.

We are convinced that the district court did not violate the *Brady* rule by refusing to grant Wayne a new trial on Count V. The government provided substantial evidence on the conspiracy count such that there is no reasonable probability that, had Wayne been able to cross-examine Hoffman concerning the suppressed evidence, the result for Count V would have differed.

## II.

■ Wayne contends that the district court also erred by denying his motions to suppress evidence seized during a search of his home because: (1) the search warrant did not describe the items to be seized with sufficient particularity; (2) the police seized items beyond the scope of the search warrant; and (3) the government did not establish an exception to the warrant requirement.

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing ... things to be seized.' " *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987). The purpose of the particularity requirement is to prevent "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The warrant in issue authorized the seizure of "Quantities of cocaine or derivatives thereof, and United States currency, documents and records which may be associated with said contraband...." (Record at 222–23). Wayne concedes that the language referring to quantities of cocaine and United States currency fulfills the particularity requirement. He takes issue, however, with the language "documents and records which may be associated with said contraband," and contends that the items seized pursuant to this clause were not described in sufficient particularity and, therefore, should have been suppressed at trial. This included weapons, communications equipment, a grinder, ledger books, address books, a rolodex, photo-graphs, a marijuana handbook, a letter from a co-conspirator, and telephone records.

In reviewing the district court's denial of Wayne's motion to suppress, we apply the clearly erroneous standard. *United States v. Schoenheit*, 856 F.2d 74, 76 (8th Cir. 1988). When we examine Wayne's contention under this standard, we conclude that the search and seizure complied with the Fourth Amendment.

The district court concluded that the terms of the warrant itself authorized the seizure of the ledger books, the address books, the rolodex, the photographs, the marijuana handbook, the letter from a co-conspirator, and the telephone records. (Suppression Hearing, Oct. 4, 1988, at 27). This conclusion was not clearly erroneous. These items were properly seized as documents and records which may be associated with contraband. This language is constitutionally acceptable because it is "sufficiently definite to enable the searcher to reasonably ascertain and identify ... the things authorized to be seized." *United States v. Johnson*, 541 F.2d 1311, 1313 (8th Cir.1976) (per curiam). "The standard to be used in this determination is one of practical accuracy rather than technical nicety." *Id.* "Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance." *Id.* at 1314.

■ Furthermore, we believe that the seizure of the remaining evidence was proper under the plain view doctrine. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge*, 403 U.S. at 465, 91 S.Ct. at 2037. "[U]nder the plain view doctrine announced in *Coolidge v. New Hampshire*, law enforcement officers can exceed the original scope of the warrant where they are engaged in an otherwise lawful search and inadvertently discover contraband or other items the incriminatory nature of which is

immediately apparent." *United States v. Ellison*, 793 F.2d 942, 948 (8th Cir.) (citation omitted), *cert. denied*, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986). Wayne concedes that the initial intrusion was lawful but maintains that there was no showing that the discovery was inadvertent or that the incriminatory nature immediately apparent.

The inadvertent discovery requirement is satisfied because the officers were authorized to search the premises for cocaine, and the items in issue here were discovered within the scope of that search. As the district court observed:

> [C]ocaine itself is easily hidden, and so the warrant would have authorized the officers to search every nook and cranny of the house, including any container in which such a small amount of cocaine could be found. Consequently—even to this extent, such a quantity of cocaine could have been hidden in the clip of a weapon, a pistol, or might even have been small enough to have been located in the barrel of such a weapon and hidden there, and so because the warrant authorized the officers to look for such a small amount of cocaine and the ease with which the cocaine can be hidden, the officers would have had the authority to pick up and examine any weapons they came across....

(Tr. 514–15).

The final requirement of the plain view doctrine, that the incriminatory nature of the evidence be immediately apparent, "is satisfied if there is 'probable cause to associate the property [seized] with criminal activity.'" *United States v. Newton*, 788 F.2d 1392, 1395 (8th Cir.1986) (quoting *Texas v. Brown*, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983)). *See also Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) (holding that officer must have probable cause to seize items under the plain view doctrine). The probable cause standard was carefully explained by the Supreme Court in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983):

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

*Id.* at 742, 103 S.Ct. at 1543 (plurality opinion) (citation omitted) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). Moreover, "the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). The connection between drug activity and the weapons, communication equipment, and grinder, was readily apparent to the experienced officers executing the search and, therefore, their seizure was proper under the Fourth Amendment.

### III.

Finally, Wayne contends that the district court erred in utilizing the Sentencing Guidelines to sentence him, in applying the Guidelines, and in sentencing him to forty years imprisonment outside of the Guidelines on Count III. We affirm the sentence imposed by the district court in all respects.

### A.

Wayne urges that utilizing the Guidelines to sentence him on Count V, the conspiracy charge, violated the *ex post facto* clause of the Constitution because there was no evidence of conspiratorial activity after November 1, 1987, the effective date of the Guidelines. He claims that he was disadvantaged by application of the Guidelines because he was deprived of the benefit of the former Good Time Allowance Statute.

■■■■ This argument is without merit. Conspiracy is a continuing offense. *United States v. Stewart*, 878 F.2d 256, 259 (8th Cir.1989). Therefore, a court may sentence a conspirator under the Guidelines, if the

conspiracy continued beyond the effective date of the Guidelines, without violating the *ex post facto* clause of the Constitution. *United States v. Walker*, 885 F.2d 1353, 1354 (8th Cir.1989) (per curiam). The jury stated in a special interrogatory that it found that the conspiracy continued beyond November 1, 1987. (Record at 378). The district court found that the conspiracy continued up to May 12, 1988, the date of Wayne's arrest. (Sentencing Hearing, Mar. 2, 1989, at 155). This is a finding of fact which we review under the clearly erroneous standard. 18 U.S.C. § 3742(e) (1988). After reviewing the ample evidence in the record under this standard, we are satisfied that the court's finding was not clearly erroneous.

### B.

■ Wayne argues that the district court erred in relying upon information and testimony from Hoffman and Newland in determining Wayne's base offense level because the suppressed evidence undermined the court's confidence in the verdict for Counts I and II and, therefore, Wayne was not convicted on those two counts.

We conclude that these factors were properly before the court at the time of Wayne's sentencing. While the court's confidence may have been undermined as to Counts I and II to the extent that it was not satisfied that a jury would have found him guilty beyond a reasonable doubt, "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." *McMillan v. Pennsylvania*, 477 U.S. 79, 91, 106 S.Ct. 2411, 2418, 91 L.Ed.2d 67 (1986). "The Supreme Court has refused to 'constitutionalize' the burden of proof necessary at sentencing proceedings." *United States v. Gooden*, 892 F.2d 725, 728 (8th Cir.1989), *petition for cert. filed*, No. 89–6786 (U.S. Feb. 6, 1990).

■ The Guidelines do not mandate a particular standard of proof for factual determinations at sentencing hearings. They state that "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has *sufficient indicia of reliability* to support its probable accuracy." U.S.S.G. § 6A1.3(a) (emphasis added). Accordingly, the court may consider quantities of drugs for which the defendant was neither indicted nor convicted, *United States v. Mann*, 877 F.2d 688, 690 (8th Cir.1989), or for which the count was dismissed pursuant to plea agreement, *United States v. Williams*, 879 F.2d 454, 457 (8th Cir.1989).

■ The district court required the sentencing factors to be proven by clear and convincing evidence. (Sentencing Hearing, Mar. 2, 1989, at 64). In *McMillan*, the Supreme Court held that the use of the less stringent preponderance of the evidence standard in sentencing proceedings was constitutional. 477 U.S. at 91–92, 106 S.Ct. at 2418–19. Therefore, we are satisfied that the court's use of the clear and convincing evidence standard satisfied constitutional requirements.

### C.

■ Wayne claims that the court erred in finding that he possessed a firearm during commission of the offense for the purpose of Guideline section 2D1.1(b)(1), which increased his offense level. This is a finding of fact which we review under the clearly erroneous standard. 18 U.S.C. § 3742(e); *United States v. Figueroa*, 900 F.2d 1211, 1218 (8th Cir.1990). The court found that the government had established, by clear and convincing evidence, that Wayne possessed a weapon during the offense. (Sentencing Hearing, Mar. 2, 1989, at 155). There was no clear error in the court's findings on this sentencing issue.

It is widely-recognized that weapons are frequently associated with the drug trade. *United States v. Matra*, 841 F.2d 837, 842 (8th Cir.1988). "Just as weapons are kept at the ready to protect military installations against potential enemy attack, so too may weapons be kept at the ready to protect a drug house, thereby safeguarding and facilitating illegal transactions." *Id.* Guideline section 2D1.1(b)(1) instructs that its enhancement for weapon possession

"should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3) (emphasis added). When Wayne's home was searched, the police seized a loaded .357 Smith & Wesson handgun, a 9 millimeter Smith & Wesson handgun, a .22 Derringer handgun, a 9 millimeter Luger handgun, and a 12–gauge Beretta shotgun. There was substantial evidence that Wayne conducted his narcotics activities from his home. Therefore, we do not believe that it was "clearly improbable" that the firearms were connected with his drug activities. Under these circumstances, we believe that the court's findings on the applicability of this Guideline section were not clearly erroneous.

### D.

■ Wayne argues that the court erred in enhancing his offense level based upon its finding that he was an organizer or leader of criminal activity for the purpose of Guideline section 3B1.1(a). We also review this finding of fact under the clearly erroneous standard, *Figueroa*, at 1218; 18 U.S.C. § 3742(e), and find Wayne's argument here equally untenable. In light of the substantial evidence in the record on Wayne's role in the offenses, this issue merits no further discussion.

### E.

■ Wayne argues that the Guidelines are unconstitutional because they do not require proof beyond a reasonable doubt, they do not permit individualized sentencing, and they impermissibly limit the discretion of the sentencing judge. We also reject these arguments.

As stated previously, there is no constitutionally mandated standard of proof for sentencing determinations. *Gooden*, 892 F.2d at 728. Only in capital murder cases does the Constitution guarantee individualized sentencing. *United States v. Sciacca*, 879 F.2d 415, 416 (8th Cir.1989). As to judicial discretion in sentencing, "the scope of judicial discretion with respect to a sentence is subject to congressional control."

*Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 650, 102 L.Ed.2d 714 (1989). While the Guidelines do circumscribe the sentencing judge's exercise of discretion, judges nevertheless retain "some power to fit sentences to the individual offender." *United States v. Brittman*, 872 F.2d 827, 828 (8th Cir.), *cert. denied*, ——— U.S. ———, 110 S.Ct. 184, 107 L.Ed.2d 140 (1989). In this case, the court determined the applicable Guideline range to be 292 to 365 months; it exercised discretion in sentencing Wayne to 300 months.

### F.

■ Finally, Wayne argues that the court acted inequitably and unconstitutionally in sentencing Wayne to forty years imprisonment on Count III when Larry Shreeves was sentenced to ten years imprisonment for the same crime. We are not persuaded by this argument.

The sentence imposed for Count III was not based upon the Guidelines because the offense occurred prior to November 1, 1987, but was based upon 21 U.S.C. § 841(b)(1)(B), which provides for a term of imprisonment of not less than five years but not more than forty years. Thus, Wayne's sentence was within the statutory range. "A sentence within statutory limits is generally not subject to review," *United States v. Boone*, 869 F.2d 1089, 1092 (8th Cir.), *cert. denied*, ——— U.S. ———, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989), and a reviewing court is limited to determining whether the district court has "manifestly or grossly abused its discretion," *Castaldi v. United States*, 783 F.2d 119, 123 (8th Cir.), *cert. denied*, 476 U.S. 1172, 106 S.Ct. 2897, 90 L.Ed.2d 983 (1986) (quoting *Woosley v. United States*, 478 F.2d 139, 147 (8th Cir. 1973) (en banc)). We believe that the court's sentence here was properly within its discretion in light of the severity of Wayne's criminal activities. The district court described Wayne as "a drug dealer of monumental proportions." (Sentencing Hearing, Mar. 17, 1989, at 351). Imposing a sentence upon Wayne which is greater than that imposed upon another defendant, whose involvement in the offense was of a

lesser degree, does not violate the equal protection clause of the Constitution, *Clark v. Solem,* 693 F.2d 59, 62 (8th Cir.1982), *cert. denied,* 460 U.S. 1090, 103 S.Ct. 1787, 76 L.Ed.2d 355 (1983), nor does it constitute cruel and unusual punishment under the Eighth Amendment, *United States v. Collins,* 690 F.2d 670, 674 (8th Cir.1982); *compare Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983) (discussing cases where comparison of sentences indicated excessive punishment).

## IV.

On cross-appeal, the government argues that the court abused its discretion in granting Wayne's motion for a new trial on Counts I and II because the court found that its confidence in the verdicts for those counts was undermined due to the suppressed evidence. The government stated, at oral argument, that it would withdraw its cross-appeal on this point if this court affirms the district court's refusal to grant a new trial on Counts III and V. We have done so, and therefore, we need not further consider the government's argument on cross-appeal.

## V.

In conclusion, we affirm the district court's grant of Wayne's motion for a new trial on Counts I and II, and its denial of a new trial on Counts III and V. We also affirm the court's judgment on the issues relating to the search warrant and on the issues concerning Wayne's sentencing.