**STATE of Minnesota, Respondent,**

v.

**Marcus Keith MILLER, Appellant.**

No. C5–02–1119.

Supreme Court of Minnesota.

Aug. 7, 2003.

Lawrence W. Pry (# 144514), Assistant State Public Defender, Minneapolis, MN, for Appellant.

Michael A. Hatch, Minnesota Attorney General, Amy Klobuchar, Hennepin County Attorney, Linda M. Freyer (# 131957), Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

GILBERT, Justice.

Appellant Marcus Keith Miller was charged by indictment in Hennepin County for first-degree murder, Minn.Stat. § 609.185(1) (2002), and second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2002), for the killing of Wendy Bozeman. A jury trial was held. The jury returned guilty verdicts on both charged counts. A sentencing hearing was held and appellant received the mandatory sentence for first-degree murder, life in prison. Appellant appeals the judgment of conviction on the following grounds: (1) the district court committed reversible error when it allowed the state to introduce DNA evidence developed through the use of PCR–STR process and random match probability statistics that were not shown to fall within this court's DNA exception to the rule against admission of quantitative, statistical probability evidence; and (2) the district court committed reversible error when it admitted testimony by police that appellant kept a list of sexual partners that included references to prostitutes, and a plastic female head used by appellant as a sex toy. We affirm.

At 5:20 in the afternoon on May 31, 2001, a woman walking her dog in Theodore Wirth Park discovered a severed human arm. She reported the discovery to park employees who then called 911. The area of the park where the arm was found was cordoned off and searched. The search eventually led to the discovery of another arm, two legs and a head. Subsequently, these remains were identified as those of Wendy Bozeman. A garbage can within the park was inspected and found to contain a plastic garbage bag. That garbage bag contained three other garbage bags, Allied parking lot ticket stubs, a *City Pages* newspaper, a Burger King french fry container, cigarette butts, blood and human tissue.

Ronald Rucker, the father of Wendy Bozeman's son, testified at trial to the following. His longtime relationship with Wendy ended and the two separated, but they remained in touch for the purpose of raising their 14–year–old son. In November of 2000, Bozeman had fallen on hard times and asked if their son could move in with Rucker. Rucker agreed, and hearing that Bozeman had no place to stay, allowed her to move into his home too. Thereafter, Bozeman lived with Rucker on and off between November and May. On May 30, 2001, Bozeman went to work at her job downtown. That evening, while their son was at a church activity, Rucker saw that Bozeman was in the bathroom and smelled the odor of cocaine coming from the bathroom. In the early morning hours of May 31, between 12:00 and 12:30 a.m., Bozeman said she "was going around the corner" and that she would be back. Rucker understood that to mean that she was going to a nearby drug house to get drugs. Bozeman left with only her keys and identification. She never returned.

The next day Rucker read in the newspaper that an African–American woman's body had been found in Theodore Wirth Park. Rucker called the police and local hospitals and was directed to the coroner's office. He called the coroner's office and provided a description of Bozeman. He was asked to come down to identify her remains. Rucker positively identified the remains of Bozeman from a photo of the remains taken by the coroner.

A surveillance camera in Theodore Wirth Park provided evidence implicating appellant. Police sergeant Erika Christensen testified as to what the video

showed, and the video was introduced into evidence. At 3:28 p.m., the video shows a Geo Tracker or Suzuki Sidekick come up to the parking lot, slow down and then go through again. The vehicle returns 5 to 8 minutes later and the driver parks it in the north end of the parking lot. A man exits the vehicle and walks to a trash can approximately 20 feet from the parking spot and appears to place a trash bag into the trash can. The man returns to the vehicle, stands for a moment in front of the vehicle, walks to the back of the vehicle and stands there for another brief moment, and then gets in the vehicle and leaves. From a review of the video the police were also able to determine that the vehicle in the video was a 1992–1996 model Geo Tracker.

Prior to the arrival of the vehicle, the only other time the video shows someone near the trash can is at 12:54 p.m. At that time a park employee, riding on a motorized cart, stops in the area of the trash can, gets out and looks inside the trash can and then gets back onto the vehicle and drives away. A man testified that he was the park employee on the video and that although he had no particular recollection of checking that garbage can, if there had been trash in the can, he would have removed it.

Paul Melchert testified that while driving through the park in the afternoon of May 31, he saw a vehicle parked on the side of the road in a no-parking area and a man standing by the curb. The back tailgate of the vehicle was open and there was a garbage bag to the man's left. Melchert testified that his attention was drawn to the man because he believed the man was dumping trash in a city park. At the time, Melchert considered reporting the man to the park authorities for illegal dumping, but ultimately decided not to report the incident and left the park. Upon reading in Monday's newspaper that human re-

mains had been found in the park, Melchert contacted the police.

Melchert testified that the vehicle was a turquoise car with a hatchback that hinged on the left side and had a black roof and purple and white decaling. He described the man he had seen as "a light-skinned African male with longer hair kind of in—I call them Jeri curls." He testified that the man was wearing a dark green jogging suit with a white patch on the front that came into a triangle. Melchert testified that he did not get a good enough look at the man to be able to identify him.

The investigating officers were able to track the Allied parking ticket stubs found in the trash can at the park back to a specific parking lot in downtown Minneapolis. The officers went to the lot and noticed a Geo Tracker matching the description of the one appearing in the surveillance video. The parking lot attendant told the officers that the driver of the Tracker worked at Augie's, a bar next to the parking lot. The officers ran the Tracker's license plate and discovered the vehicle was registered to appellant.

The officers returned to the parking lot later in the day and upon seeing that the Tracker was still in the lot, entered Augie's pretending to be license inspectors with the Minneapolis Police Department. Appellant informed the officers that his shift had ended at 8 p.m. on May 30 and he had not worked on May 31.

Appellant was placed under police surveillance. While under surveillance he drove to the Salvation Army and left a garbage bag at the front door. The police recovered the bag. The bag contained numerous empty beer and liquor bottles, women's jewelry and paper backing from self-adhesive floor tiles. The officers followed appellant back to his home where they could see through the window that he was "scrubbing or cleaning something."

Appellant did not testify at trial. The investigating officers provided the following testimony. Appellant, having heard that he was under investigation, on his own initiative, went to the Minneapolis police homicide office. There he met with the investigating officers, the same officers who had talked to him earlier at Augie's when posing as liquor license inspectors. Appellant spoke with investigators for 3 hours. Appellant denied knowing Bozeman. Appellant explained that he was employed as a disk jockey at Augie's in downtown Minneapolis and lived in an apartment that was part of a warehouse space. He was converting part of the warehouse space into a training facility for disk jockeys. Appellant told the officers that he had worked at Augie's on May 30 until 8 p.m., and that after work he spent the evening hours drinking at several bars in Minneapolis. Appellant said that he returned to Augie's at around 1:15 a.m. in order to give one of the club's dancers a ride home. Appellant told the officers that he drove home fast because he was drunk and that he arrived at his home between 2:00 and 2:30 a.m.

Appellant claimed that he was home alone in his residence from 2:00 or 2:30 a.m. until he woke up the next day around noon. Appellant told the officers that he had a severe hangover from the previous night and spent quite some time throwing up. He felt like he needed to get out of the house, so he went to a nearby store where he purchased an orange. He then drove to Theodore Wirth Park to eat the orange in order to alleviate the effects of the hangover. He claimed he ate the orange and threw the remainder of the orange in the trash and then left. He also said that he was wearing a green Michigan State shirt and gray sweatpants that day.

During the course of the interview, one of the officers left the room and was in-formed that appellant's fingerprints were found on one of the parking ticket stubs found in the trash can at the park. The officers then continued the interview, asking more direct questions about the murder of Wendy Bozeman. Appellant claimed that he picked up some garbage near the curb while at the park and threw it in the trash can. When confronted with the descriptions of the surveillance video and the statement by Melchert, appellant denied stopping in the area where the remains were discovered and stated that he merely slowed down because of the speed limit signs. Appellant explained that when he found the trash bag on the curb, he had cleaned out his vehicle. At the conclusion of the interview, appellant was arrested and taken to the Hennepin County Jail Intake.

Search warrants were then drawn up for appellant's residence and another address that was listed on appellant's driver's license. The Minnesota Bureau of Criminal Apprehension (BCA) began the search of appellant's residence at around 7 or 8 p.m. on June 7. When the officers entered they noticed a strong order of chlorine bleach, which seemed to be coming from the bathroom. In the doorway of the bathroom were a bucket and mop. An officer described the shower curtain as looking new. The bathroom walls were painted black. The officers also found a paint roller with black paint and several previously opened containers of black paint.

The officers seized a roll of black trash bags from the kitchen and these bags were found to be of the same general type as those found in the trash can at the park. In the sleeping area of the residence the police found a plastic female head with a mouth that opened and closed, described as a sex toy by the officer testifying at trial. The plastic female head sex toy was seized pursuant to a second search war-

rant, issued on June 8, 2001. This second warrant was issued after the officers had entered appellant's residence pursuant to the first search warrant. This second search warrant sought permission to seize items that the officers had seen while in appellant's residence when executing the first search warrant including "[s]exual toys or devices or any items of that nature used for sexual acts." The warrant was supported by an affidavit from Sergeant Christensen. Residue on the doll subsequently tested positive for the presence of semen.

The investigating officers testified that the floor of appellant's shower stall appeared to have been damaged by a sharp tool. In parts of the shower these markings had been melted and reshaped in what the officer hypothesized was an attempt to cover up evidence that the shower had been damaged. Appellant's residence contained a number of hand tools, a cordless drill, soldering irons and a torch. In the office area the police found an article discussing the human skeleton. A list of appellant's sexual partners was also found. Among the names on the list there were nine entries where the sexual partners were referred to as prostitutes.

At the entrance to the bathroom, under the floor tiles, the investigators found what appeared to be blood. DNA tests were conducted on the samples and were found to be a match with Wendy Bozeman's DNA profile. Later, after the BCA team had left, the Minneapolis homicide officers assigned to the case returned to appellant's residence. One of the officers noticed a group of blood spatters on the wall in the bathroom that the BCA investigative team had not noticed. The BCA team was called back to the residence and collected the samples; these blood samples also were a DNA match with Wendy Bozeman. A BCA forensic scientist explained the testing procedure and the statistical significance of the matches he found, testifying that "we did not expect to see this DNA profile occur more than once in the world's population."

Appellant's Geo Tracker was seized for processing. The Tracker, green with white and purple pinstripes and a black soft top, matched the description provided by Melchert and the vehicle shown in the surveillance video. Several locations within the Tracker tested positive for the presence of blood, including areas of the back seat, the seat belt, the wheel-well cover, the driver's door handle, the steering wheel, the carpeting and on the rear bumper area. Three samples from the Tracker were subjected to DNA testing, one from the seat belt, one from a side panel next to the passenger side back seat and a third from the steering wheel. The sample from the steering wheel matched the DNA of appellant. The other two samples matched the DNA of Bozeman.

The Hennepin County assistant chief medical examiner testified that an autopsy conducted on the human remains found in the park revealed a variety of injuries, including sharp force injuries and blunt force injuries, which consisted of bruises, scratches, lacerations or tears into the skin surface. The death was classified "as homicide in manner due to complex homicidal violence." Evidence of hemorrhaging present in the victim's airway and in her eye indicated that she had been choked or strangled. The condition of the remains was consistent with the victim having been killed within 24 hours of the time of the autopsy. The most likely cause of death was strangulation. The victim also had suffered hemorrhage to the brain caused by trauma to the head. Tests revealed that the victim was under the influence of cocaine at the time of death. The examin-

er also testified that dismemberment occurred after the victim was dead.

The torso of an African–American woman was found near railroad tracks in north Minneapolis on June 21. The torso had decomposed to such an extent that it was not possible to conduct a DNA test to match it to Bozeman. An examination of the level of decomposition, including study of insects within the torso, was consistent with the torso having been at the site where it was found for 2 to 3 weeks before it was discovered, which would be consistent with the torso being dumped around the same time as the human remains found in Theodore Wirth Park.

I.

Appellant presents two arguments that the admission of DNA evidence was error. The first claim is that the PCR–STR process used by the BCA has not been proved to produce results that are accepted as reliable and trustworthy within the scientific community. A *Frye–Mack* hearing was not held in this case. But at trial, defense counsel filed a motion in limine to exclude any testimony regarding the DNA evidence because it involved the use of the STR system. The defense argued that the then-recent court of appeals decision in *State v. Traylor*, 641 N.W.2d 335 (Minn. App.2002), *rev'd*, 656 N.W.2d 885 (Minn. 2003), should be considered authority for excluding the DNA evidence, which involved the use of the STR process. The DNA evidenced was allowed.

James A. Liberty, a BCA Forensic Science Laboratory employee, testified at trial as to the results of the DNA tests, which indicated Bozeman's blood was found on appellant's bathroom wall, the floor at the threshold to his bathroom and within his Geo Tracker. Liberty testified that the frequency with which one would expect to see the DNA profile match that

of Bozeman was "once in the world's population." Liberty also testified that a sample of blood from the steering wheel of the Geo Tracker, matched that of the appellant, and the chance of selecting someone at random from the population who would be a match for that profile was "one in one billion." Liberty attributed the significant difference in the two statistical probabilities given to the fact that there was insufficient DNA present on the steering wheel to do testing with two kits, therefore only one kit was used. There was no effort by defense counsel to cross-examine on the frequency testimony nor was any rebuttal evidence offered on the point.

■ Evidentiary rulings are within the discretion of the district court. *State v. Ashby*, 567 N.W.2d 21, 25 (Minn.1997). We review evidentiary rulings for an abuse of discretion. *Id.*

Appellant's trial occurred after the court of appeals ruling in *State v. Traylor*, but before this court's reversal of that ruling. *State v. Traylor*, 656 N.W.2d 885 (Minn. 2003). Appellant's brief to this court was also written before our decision in *Traylor* and states, "Whatever result this Court reaches in *Traylor* will be dispositive of Miller's challenge to the PCR–STR testing performed in this case." We approved use of PCR–STR testing methodology in *Traylor*. 656 N.W.2d 885. Appellant concedes the *Traylor* decision resolved the issue so as to eliminate the PCR–STR claim. We agree.

Appellant next argues that the testimony of the BCA expert was not based on the "interim ceiling method" recommended by the National Research Council and approved by this court in *State v. Bloom*, 516 N.W.2d 159 (Minn.1994). Appellant argues that in this case the state did not establish that the statistics to which Liberty testified fell within the exception to the

prohibition on statistical evidence that we recognized in *Bloom.*

The state claims appellant's argument is nonsensical for two reasons. First, the state contends the National Research Council (NRC) no longer recommends the "interim ceiling method." The state goes on to assert that in 1996 the NRC concluded the "interim ceiling method" was no longer scientifically justifiable and that frequency statistics should instead be calculated using the "product rule method." The state quotes the 1996 NRC report as stating, " 'In general, the calculation of a profile frequency should be made with the product rule' both for VNTR[1] and PCR based systems."

The second argument the state offers to refute appellant's claim is that the NRC did not recommend the "interim ceiling method" for use in conjunction with STR testing. The state claims that in 1996 the NRC explained that the "interim ceiling method" was designed and intended for use with the VNTR-based systems. Furthermore, that same year the NRC concluded that the "product rule method" was the appropriate method for use with VNTR-based testing as well as STR-based testing. The state concludes by arguing that because we approved STR testing in *Traylor,* it naturally follows the "product rule method" is the appropriate method.

Appellant, in his reply brief, states that he does not dispute the state's characterization of the NRC's position on the use of the ceiling principle in conjunction with PCR-based testing. Appellant argues that in *Bloom* this court expressed concern that population frequency statistics would be misunderstood by the jury as a quantification of the likelihood that a defendant is guilty. Appellant offers further support for this position by citing *State v. Kromah,*

657 N.W.2d 564 (Minn.2003), where we advised courts to be aware of "the potentially prejudicial nature of the statistical probability evidence and ensure that DNA identification evidence is not presented in a misleading or unfairly prejudicial way." *Id.* at 567. Appellant argues that the district court did nothing to limit the prejudicial impact of the statistical evidence, thus, the admission of the evidence was reversible error.

In recognition of the fact, acknowledged by both parties to this action, that the NRC recognizes the "product rule method" as the appropriate method to use with STR testing, we conclude the district court did not abuse its discretion by admitting the statistics based on the "product rule method." Here, the evidence was not presented in a misleading or unfairly prejudicial way. Furthermore, at trial, the defendant did not offer any rebuttal evidence on this point, attempt any cross-examination on this testing or request any jury instruction to limit the prejudicial effect of the evidence. As such, the district court was not required sua sponte to instruct the jury.

## II.

Appellant presents three distinct arguments that the evidence of a list of sexual partners, including references to prostitutes, and a plastic female head sex toy were unlawfully seized in violation of the Fourth Amendment. First, appellant argues that the first search warrant was invalid as it relates to authorizing the seizure of the list of appellant's sexual partners because the warrant lacked the necessary particularity. Second, he claims the affidavit supporting the first search warrant did not contain sufficient information for the issuing judge to find probable

---

1. Variable Number of Tandem Repeat.

cause supporting a search for the "personal writings and notes." Finally, appellant argues that the second warrant likewise did not provide a basis for a finding of probable cause for the plastic female head sex toy. Appellant's motion to suppress the evidence was denied by the district court at the conclusion of a *Rasmussen* hearing held immediately preceding appellant's trial.

■ "[W]hen reviewing a district court's probable cause determination made in connection with the issuance of a search warrant [we] * * * afford the district court's determination great deference." *State v. Rochefort*, 631 N.W.2d 802, 804 (Minn.2001). We "review[ ] a district court's decision to issue a warrant only to consider whether the issuing judge had a substantial basis for concluding that probable cause existed." *Id.* "[D]oubtful or marginal cases should be largely determined by the deference to be accorded to warrants." *Id.*

We begin our analysis by addressing appellant's argument that the first search warrant was invalid as it relates to authorizing the seizure of the list of appellant's sexual partners because the warrant lacked the necessary particularity as it relates to the seizure of "personal writings and notes."

The first search warrant authorized a search and seizure of the following:

A human torso; Photographic and video evidence; latent and visible blood evidence; latent and visible fiber evidence mailings to show occupancy; black, plastic garbage bags; parking lot tickets; Cigarette butts; personal writings and notes; address books; vehicle information; possible murder weapons which would cause a "chop-type" injury; residual blood/fiber evidence in sink traps or drains; womens clothing to include blue jeans, a dark jacket, light-colored tennis

shoes; items belonging to the victim, "Wendy Bozeman"; mens clothing to include gray sweatpants, green sweatshirt (possibly MI State); any other evidence tending to show the crime of murder has occurred and that a specific person(s) committed the murder.

Appellant cites *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), to support the argument that this search was unconstitutionally broad as applied to the list of sexual partners. In *Andresen*, the Supreme Court stated the following:

General warrants of course, are prohibited by the Fourth Amendment. "(T)he problem (posed by the general warrant) is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings ... (The Fourth Amendment addresses the problem) by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971). This requirement " 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford v. Texas*, 379 U.S. 476, 485 [85 S.Ct. 506, 13 L.Ed.2d 431] (1965) (quoting *Marron v. United States*, 275 U.S. 192, 197 [48 S.Ct. 74, 72 L.Ed. 231] (1927)).

*Andresen*, 427 U.S. at 480, 96 S.Ct. 2737.

The state cites as persuasive authority, *United States v. Wayne*, 903 F.2d 1188 (8th Cir.1990). The search warrant at issue in *Wayne* authorized seizure of "[q]uantities of cocaine or derivatives thereof, and United States currency, documents and records which may be associated with said contraband." *Id.* at 1195. In *Wayne*, the defendant argued that "docu-

ments and records which may be associated with said contraband" lacked the requisite particularity under the Fourth Amendment. *Id.* The court held constitutionally permissible the subsequent seizure of "ledger books, the address books, the rolodex, the photographs, the marijuana handbook, the letter from a co-conspirator, and the telephone records." *Id.* The court concluded that the provision allowed the searcher to identify the objects authorized to be seized and stated:

> The standard to be used in this determination is one of practical accuracy rather than technical nicety. Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance.

*Id.* (quoting *United States v. Johnson,* 541 F.2d 1311, 1313–14 (8th Cir.1976)).

We have recognized that when determining whether a clause in a search warrant is sufficiently particular, the circumstances of the case must be considered, as well as the nature of the crime under investigation and whether a more precise description is possible under the circumstances. *State v. Poole,* 499 N.W.2d 31, 34 (Minn.1993) ("We have recognized that there is a degree of flexibility to the particularity requirement."); *State v. Ruud,* 259 N.W.2d 567, 573 (Minn.1977) ("A warrant can only be as specific as the nature of the materials sought will allow."). In *State v. Hannuksela,* 452 N.W.2d 668, 674 (Minn.1990), we acknowledged that at the time the warrant was sought the officers "did not definitely know all of the circumstances surrounding [the victim's] disappearance although they were then in possession of sufficient facts to establish probable cause that he was the victim of foul play and that appellant was involved." In that case we held the district court did not err by admitting evidence that was seized pursuant to a warrant authorizing the search of the defendant's residence and the seizure of "personal property belonging to [the victim]." *Id.* at 672, 674.

■ Granting the district court considerable deference, as is required when reviewing the issuance of a warrant, we conclude that under the totality of the circumstances the search warrant was sufficiently particular to authorize the seizure of the list of sexual partners. *See Hannuksela,* 452 N.W.2d at 674 (concluding "under all of the circumstances" the warrant met minimal constitutional standards). The warrant at issue here authorized seizure of "personal writings and notes [and] address books." The list at issue here is personal writings and notes with some characteristics of an address book. It contained a list of former acquaintances, as would be expected to be contained within an address book, but in this case the personal information recorded about each person was not related to where they lived, but rather were notes related to their previous sexual encounter with appellant. Accordingly, in seizing the list the police did not need to effect a "general exploratory rummaging in [appellant's] belongings," *Andresen,* 427 U.S. at 480, 96 S.Ct. 2737, but were able to seize only those things fitting the particular description of "personal writings and notes [and] address books." As such, the warrant was sufficiently particular as it relates to the list of sexual partners seized from appellant's residence.

■ Appellant next claims that even if the warrant was sufficiently particular in describing the list of sexual partners, there was no probable cause to support the seizure of either the list or the plastic female

head sex toy. Appellant claims that because the list of sexual partners made no mention of Bozeman, it lacked the necessary nexus to her disappearance, death and dismemberment to have been supported by probable cause.

■ A judge, based on the information provided regarding the nature and circumstances of a crime, may use common sense to draw reasonable inferences as to what evidence is likely to be found. In *Illinois v. Gates,* 462 U.S. 213, 231–32, 103 S.Ct. 2317, 76 L.Ed.2d 527, (1983), the United States Supreme Court stated the following:

Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. As these comments illustrate, probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

*Gates* addressed the information needed to support a probable cause finding that would result in the issuance of a search warrant, not the probable cause relating to a particular piece of evidence within the suspect's home. *Id.* at 231, 103 S.Ct. 2317. Nonetheless, the case is instructive in that it cautions against the formulation of a "neat set of legal rules" for issues relating to probable cause. Thus, in determining whether the warrant application provided probable cause for the seizure of the lists of sexual partners, the question is whether the evidence listed in the warrant application linking appellant to Bozeman was such

that law enforcement could make the reasonable inference that appellant's home contained "personal writings and notes [and] address books" that would provide evidence of Bozeman's murder. We conclude that the inference was reasonable and there was sufficient information to support a probable cause finding.

■ Appellant argues that the affidavit supplied by Sergeant Christensen as part of the warrant application was too subjective, vague and conclusory to justify issuance of the second warrant for the seizure of the plastic female head sex toy, and cites *State v. Souto,* 578 N.W.2d 744, 749 (Minn.1998), as support for this argument. In *Souto* we stated that assertions in a warrant affidavit are too vague and conclusory to support probable cause if the issuing magistrate cannot independently evaluate the officer's conclusions. *Id.* However, in *Souto,* the law enforcement affiant merely stated "he knew" that the defendant was involved in possession or distribution of drugs. *Id.* Here, the officer stated in the affidavit that she knew the plastic head was in the home, having seen it upon entering the house pursuant to the first warrant, evidence placed appellant at the place where the remains were found, and the remains included a severed head of a woman. The officer's theory, expressed in the supporting affidavit, was that based on her training, and given the nature of this homicide, the plastic head was "symbolic" of the manner in which the victim was decapitated. Such a theory was supported by the facts of the case known at the time. As such, we conclude that the district court judge did not err in finding probable cause to support the seizure of the plastic female head sex toy.

### III.

Appellant next asserts that even if the district court did not err by not suppress-

ing the list of sexual partners and the plastic head, the evidence was not admissible under Minn. R. Evid. 402 and 403. We review a district court's evidentiary rulings for an abuse of discretion. *Ashby*, 567 N.W.2d at 25.

■ Appellant argues that the list of sexual partners was not relevant under Minn. R. Evid. 402, because the victim's name was not on the list, the list contained only a small number of prostitutes, and the evidence that the victim was engaged in prostitution was also weak. We disagree.

The evidence of a list of sexual partners that contained references to prostitutes is relevant under Minn. R. Evid. 402. The list revealed that appellant on occasion had sex with prostitutes. Rucker testified that the night Bozeman disappeared she went to buy drugs and that on occasion Bozeman would engage in prostitution in order to support her drug habit. As such, the list is circumstantial evidence of a connection between the victim and appellant.

■ Appellant argues that even if the evidence is considered relevant, its probative value is outweighed by the prejudicial effect and, as such, should have been excluded under Minn. R. Evid. 403. In support of this contention, appellant cites *State v. Harris*, 521 N.W.2d 348, 351–52 (Minn.1994). The evidence that appellant kept a list of sexual partners is quite distinct from the situation in *Harris*, where evidence was introduced that the defendant masturbated to the newspaper photo of the victim while in his jail cell. *Id.* at 353. Here, the evidence is far less inflammatory and is highly relevant to the state's case because it shows a potential link between appellant and the victim. Furthermore, the district court took steps to re-

duce the prejudicial effect of the list of sexual partners. The list of sexual partners was not introduced into evidence and no reference was made to the sexual acts on the list, nor was the list provided to the jury. Rather, it was made a court exhibit. The testifying officer was asked if a list of sexual partners was found, to which he responded in the affirmative. He was then asked how many references there were to prostitutes and he responded that there were nine such references. Again, in the state's rebuttal to appellant's pro se closing argument,[2] wherein appellant mentioned the list of sexual partners, the state explained the list of partners was relevant only because it showed the appellant's interest in having sex with prostitutes and the victim was known to have engaged in prostitution.

Appellant further claims that the plastic female head sex toy was not relevant and any relevance the plastic head had was outweighed by its prejudicial effect: Thus, the plastic head should have been excluded under Minn. R. Evid. 402 and 403.

The state counters by arguing that the plastic head was relevant because it was symbolic of Bozeman's decapitation. The district court allowed the plastic head into evidence concluding, "[I]t has some probative value. There is argument that the victim in this case was dismembered, her head was found in a separate spot, the [plastic] head is. prominently displayed in the house." Sergeant Christensen testified at trial and described the appearance of the interior of appellant's living quarters on the night the police entered it pursuant to the first warrant. The state asked whether anything grabbed the sergeant's attention. After defense counsel's objection was overruled she explained that in

2. At the close of the trial, appellant, against the advice of counsel, chose to discharge his counsel in order to give his own pro se clos-

ing argument. After the completion of that closing argument, upon appellant's request, counsel was reappointed.

the middle of the sleeping area was a doll with a red wig and sunglasses. She went on to explain that it was sitting on two rolls of toilet paper. She described the doll as made of a soft, flesh-like material and explained that it was anatomically correct with a mouth that opened and closed. In the corner of the mouth was a sperm-like substance. The plastic head was then marked for identification and received into evidence. Liberty testified that the material found on the doll was semen. Although the state argued to the district court and upon appeal that the plastic head was symbolic of the victim's decapitation, that argument was never made to the jury.

 Although the state's theory that the plastic head is symbolic of the decapitation does involve some conjecture, we cannot conclude the district court abused its discretion by finding the evidence to be sufficiently relevant under Minn. R. Evid. 402. Much the same rationale as applied to the list of sexual partners can also be applied to references to the plastic head. Although appellant argues that its introduction portrayed him as a depraved sexual deviant; the evidence does not appear to have the inflammatory nature of the evidence we held to have been admitted in error in *Harris*. While the district court's conclusion that the plastic head was relevant because the victim was decapitated requires substantial inference, such rulings are best left to the discretion of the district court and are reviewed for an abuse of discretion. As such, we conclude the district court did not abuse its discretion by allowing the limited references to and introduction of the plastic head sex toy, nor did it err by admitting evidence relating to the list of sexual partners referencing prostitutes.

## IV.

In his pro se brief appellant argues that the assistance he received from counsel was unreasonable and he identifies a number of specific actions taken by counsel, either acts or omissions, that he alleges failed to meet the prevailing professional norms of a defense counsel.

 "An appellant arguing that he or she received ineffective assistance of counsel must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998). The appellant bears the burden of proof on an ineffective assistance of counsel claim. *Id.* There is a strong presumption "that counsel's performance fell within a wide range of reasonable assistance." *Id.* Counsel's decisions regarding trial strategy are granted particular deference. *Id.* "Which witnesses to call at trial and what information to present to the jury are questions that lie within the proper discretion of the trial counsel." *Id.* at 789–90 (quoting *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986)).

Appellant argues that his trial counsel failed to present a witness that would place appellant somewhere else during the time the victim was last seen alive, and an eyewitness who had seen the victim in the presence of an unknown person when the victim was last seen alive. Appellant alleges that his trial counsel knew about these witnesses, but did not believe that they would make much difference, because DNA would be the main issue. Appellant further asserts that his trial counsel was ineffective because counsel failed to somehow act upon the fact that some unidentified fingerprints were found on items in the trash at Theodore Wirth Park, unidentified fibers were found on the recovered

torso, and a light switch and a plastic pail in appellant's residence contained DNA that remains unidentified. Appellant fails to articulate precisely how his counsel could have responded to this information, and merely asserts "counsel should have acted upon this with the training and experience they possessed instead of concentrating on one thing." Appellant further argues that his trial counsel was ineffective by failing to properly cross-examine the witnesses against him. Appellant claims that Melchert, who testified that he saw a light-skinned African–American man, with a garbage bag standing next to a Geo Tracker near the area of the park where the trash containing blood and tissue was found, improperly described that the Geo Tracker's tailgate opened on the right, whereas appellant claims that model Tracker opens from the left. Appellant alleges that by failing to point out this alleged mistake his trial counsel was deficient.

Appellant further claims that his trial counsel was ineffective during cross-examination of Sergeant Michael Carlson, the investigator who found blood spatter on the wall of the bathroom after the BCA investigative team had left. The BCA team was then called back and collected the blood samples, which were a match with DNA from Bozeman. Appellant complains that counsel failed to ask the "effective" questions during Carlson's cross-examination. Appellant also alleges that the cross-examination of Rucker was so deficient as to merit a new trial. Specifically, appellant complains that his trial counsel failed to point out, through cross-examination, that Rucker was twice arrested for domestic assault against Bozeman and that she filed an order for protection wherein she stated that Rucker had said, "I'll kill you." Finally, appellant claims that in a pretrial, out-of-court conference, his counsel told him that he had represented Ruck-

er in a previous case and there may be a conflict of interest, but doubted that the court would dismiss him from the case so late in the process.

Appellant's claims focus almost entirely on trial tactics. In *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986), we stated, "trial tactics should not be reviewed by an appellate court, which, unlike the counsel, has the benefit of hindsight." We went on to recognize that "[c]ounsel must, after all, have the flexibility to represent a client to the fullest extent possible." *Id.* The claims raised by appellant in his pro se brief are of the type we have repeatedly declined to recognize as amounting to ineffective assistance of counsel. *See Jones,* 392 N.W.2d at 236 (Minn.1986).

Finally, appellant has failed to provide an argument that the various tactical decisions of his trial counsel with which he now takes issue with on appeal prejudiced his case. Thus, even if counsel's performance was deficient, appellant has failed to carry his burden of demonstrating that the representation resulted in prejudice. *See Lahue,* 585 N.W.2d at 790.

Appellant's final claim of ineffective assistance of his trial counsel is that one of his attorneys mentioned in an out-of-court conference that he had represented Rucker in a previous matter, and that it might be considered a conflict of interest, but the court would not dismiss counsel so late in the process. Appellant implies that this conflict of interest led to his counsel's decision not to cross-examine Rucker on his tumultuous and sometimes violent history with Wendy Bozeman. However, the decision not to cross-examine Rucker on that issue can also be considered a tactical decision. We have held that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate

for his claim of ineffective assistance." *Gustafson v. State,* 477 N.W.2d 709, 713 (Minn.1991) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Appellant has provided no evidence to support his claim that a conflict of interest existed. Appellant's ineffective assistance of counsel claim is without merit.

Affirmed.

## CONCURRENCE AND DISSENT

PAGE, Justice (concurring in part, dissenting in part).

I concur in the result and in most of the court's reasoning. I cannot agree, however, with the court's conclusion that the trial court did not abuse its discretion in admitting the plastic head sex toy into evidence. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. The plastic head sex toy was not relevant to the victim's decapitation or to anything else. The fact that Miller possessed the sex toy does not tell us anything about whether he killed the victim. Moreover, because this evidence lacked any probative value, the danger of unfair prejudice was clear and present. *See* Minn. R. Evid. 403 (stating "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

The trial court's abuse of discretion notwithstanding, I would hold, on the record presented, that the error in admitting this piece of evidence was harmless. *See State v. Chomnarith,* 654 N.W.2d 660, 665 (Minn.2003) (noting that, if no constitutional violation has been alleged, the test for measuring whether the trial court's abuse of discretion was harmless is whether the error substantially influenced the jury's decision).

MEYER, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Page.